O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

SCOTTSDALE INSURANCE
  COMPANY, an Ohio corporation,

     Plaintiff,

  v.

BEACHCOMBER MANAGEMENT
  CRYSTAL COVE, LLC, a
  California limited liability company,
BEACHCOMBER AT CRYSTAL
  COVE, LLC, a California limited
  liability company,
SHAKE SHACK CRYSTAL COVE,
  LLC, a California limited liability
  company,
DOUGLAS CAVANAUGH, a
  California citizen, and
RALPH KOSMIDES, a California
  citizen,

     Defendants.

RICHARD A. MARSHACK, Chapter 7
  Trustee and Assignee of Claims
  from BEACHCOMBER AT
  CRYSTAL COVE, LLC, a
  California limited liability company,
  and SHAKE SHACK CRYSTAL
  COVE, LLC, a California limited
  liability company,

     Counterclaimant,

  v.

Case No. 8:22-cv-01300-JWH-KES

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT [ECF No. 49] AND
DENYING
COUNTERCLAIMANT'S
MOTION FOR SUMMARY
JUDGMENT [ECF No. 50]**

SCOTTSDALE INSURANCE
    COMPANY, an Ohio corporation,

            Counterdefendant.

# I. SUMMARY OF DECISION

Before the Court are cross-motions for summary judgment filed by Plaintiff and Counterdefendant Scottsdale Insurance Company[1] and Counterclaimant Richard A. Marshack (the "Trustee"),[2] respectively.  After considering the papers filed in support and in opposition,[3] the Court **GRANTS** the Scottsdale Motion and **DENIES** the Trustee Motion, for the reasons set forth herein.

# II. BACKGROUND

## A.    Facts

### 1.    The Prior Policy

Non-party Underwriters at Lloyd's, London ("Lloyd's") issued Directors and Officers Liability Insurance Policy No. AUGBC 00186J (the "Prior Policy") to non-party Ruby's Diner, Inc. ("RDI") and Defendant Beachcomber Management Crystal Cove, LLC ("BMCC"), effective for the period from September 1, 2019, to September 1, 2020 (the "Prior Policy Period").[4]  The Prior Policy contained a $5 million limit of liability, and it provided coverage to RDI, BMCC, and their Directors and Officers for a "Loss" resulting from a "Claim" first made against an Insured during the Prior Policy Period for a "Wrongful Act."[5]

RDI owns and operates the Ruby's Diner restaurant chain of 1940s style diners in Southern California, and it is presently a debtor in a Chapter 7 bankruptcy case pending in

---

[1]    Pl.'s Mot. for Summary Judgment (the "Scottsdale Motion") [ECF No. 49].

[2]    Countercl.'s Mot. for Summary Judgment (the "Trustee Motion") [ECF No. 50].

[3]    The Court considered the documents of record in this action, including the following papers:  (1) Compl. (including its attachments) [ECF No. 1] (the "Complaint"); (2) Countercl. (the "Counterclaim") [ECF No. 36]; (3) Scottsdale Motion (including its attachments); (4) Defs.' Opp'n to the Scottsdale Motion (the "Scottsdale Opposition") [ECF No. 52]; (5) Pl.'s Reply in Supp. of the Scottsdale Motion (the "Scottsdale Reply") [ECF No. 54]; (6) Trustee Motion (including its attachments); (7) Pl.'s Opp'n to the Trustee Motion (the "Trustee Opposition") [ECF No. 53]; and (8) Countercl.'s Reply in Supp. of the Trustee Motion (the "Trustee Reply") [ECF No. 55].

[4]    Joint Statement of Undisputed Facts and Genuine Disputes (the "Joint Statement") [ECF No. 49-2] No. 151.

[5]    *Id.*, Nos. 152 & 157.

the United States Bankruptcy Court for the Central District of California.[6]  RDI's
founders, key executives, and principals are Defendants Douglas Cavanaugh and Ralph
Kosmides.[7]  BMCC, along with co-Defendants Beachcomber at Crystal Cove, LLC
("BCC") and Shake Shack Crystal Cove, LLC ("SSCC"), own and operate two
restaurants in Crystal Cove State Park in Orange County, California.[8]  BMCC, BCC, and
SSCC are owned and operated, in part, by Cavanaugh and Kosmides.[9]

###### 2.    The Draft Complaint

On October 28, 2019, the Official Committee of Unsecured Creditors in RDI's
bankruptcy case (the "Committee") sent a letter to Lloyd's seeking coverage under the
Prior Policy for a Draft Complaint.[10]  The Committee's Draft Complaint asserted claims
against Cavanaugh and Kosmides, but BMCC, BCC, and SSCC were not named as
defendants.[11]  The Draft Complaint was 17 pages long, with 40 separately numbered
paragraphs of allegations.[12]

The allegations in the Draft Complaint are summarized as follows:

In early 2012, RDI borrowed $5 million to buy out two partners—non-parties
Douglas Salisbury and Doug DeCinces—after years of ongoing disputes with them.[13]  The
ongoing disputes were sufficient to put Cavanaugh and Kosmides on notice of the need to
address and resolve, among other things:

- the adequacy of RDI's business, financial, and accounting procedures and its
  ability adequately to project operating costs, to track expenditures, and to
  prioritize the payment of business expenditures;
- RDI's lack of a bank-issued revolving line of credit for RDI to cover operating
  costs, as needed;

---

[6]    *Id.*, Nos. 2 & 3.

[7]    *Id.*, Nos. 4 & 5.

[8]    *Id.*, No. 9.

[9]    *Id.*, No. 10.

[10]    *Id.*, No. 158; Index of Joint Ex. (the "Joint Exhibits Volume 1") [ECF No. 49-3] Part A,
Ex. 3 82-98 (the "Draft Complaint").

[11]    Joint Statement Nos. 14 & 15; *see generally* Draft Complaint.

[12]    Joint Statement No. 13; *see generally* Draft Complaint.

[13]    Joint Statement No. 16; Draft Complaint ¶ 11.

- the repayment of the approximately $5.6 million in outstanding private loans made to RDI or its affiliates, other than by simply rolling-over or replacing them with new loans;
- the repayment or restructuring of approximately $2.9 million in previously incurred and outstanding privately held secured debt;
- the repayment of the approximately $4 million secured loan from Opus Bank and the $1 million unsecured loan, which was apparently used to settle the DeCinces litigation;
- the need for full-time, sophisticated internal finance and accounting personnel to monitor RDI's business and financial books and records and to advise Cavanaugh and Kosmides regarding ongoing cash needs and the projected availability and use of operating income and other funds for proposed and actual company expenditures and to provide guidance regarding the prioritization of those expenditures; and
- the absence of RDI audited financial statements and the need immediately to retain an independent certified public accounting firm experienced in restaurant operations to review and audit RDI's financial records periodically and to advise Cavanaugh and Kosmides regarding RDI's financial affairs.[14]

Cavanaugh and Kosmides caused RDI to enter into and to consummate business arrangements with non-debtor entities that were not arm's-length transactions and that were not in RDI's best interest.[15] Cavanaugh and Kosmides violated their fiduciary obligations to RDI and its creditors by causing RDI to make distributions to themselves or for their benefit or for other purposes that were not in the best interest of RDI and its creditors.[16] At all times from and after 2012, through the date that RDI filed its Disclosure Statement in its bankruptcy case, Cavanaugh and Kosmides further breached their fiduciary duties to RDI and its creditors by withholding relevant information from RDI's creditors that would have put them on notice of their rights and claims.[17] RDI inevitably spiraled into bankruptcy, and Cavanaugh and Kosmides should have known that they lacked the financial and economic education, skills, and acumen to operate RDI profitably.[18]

In its Draft Complaint, the Committee asserted the following causes of action:

---

[14]   Joint Statement No. 17; Draft Complaint ¶ 12.

[15]   Joint Statement Nos. 18 & 22; Draft Complaint ¶¶ 14 & 15.

[16]   Joint Statement No. 160; Draft Complaint ¶ 22.

[17]   Joint Statement No. 162; Draft Complaint ¶ 22.

[18]   Joint Statement No. 24; Draft Complaint ¶¶ 17 & 18.

- breach of fiduciary duty;
- recovery of illegal dividends under Cal. Corp. Code §§ 500, 501, & 506;
- disallowance of proofs of claim pursuant to 11 U.S.C. § 502(d);
- equitable subordination of claims pursuant to 11 U.S.C. § 510(c);
- permanent injunction pursuant to Cal. Civ. Code § 3439.07(a)(3)(A); and
- permanent injunction pursuant to Cal. Civ. Code § 3439.07(a)(3)(C).[19]

The Draft Complaint did not use the words "corporate opportunity"; it did not include allegations that the opportunity to own and operate the Crystal Cove Restaurants was a corporate opportunity that belonged to RDI; and it did not include allegations describing how the opportunity to own and operate the Crystal Cove Restaurants arose.[20]  Lloyd's responded to the Committee's letter by providing coverage for the claims asserted in the Draft Complaint.[21]

On April 16, 2020, the Bankruptcy Court appointed the Trustee as the Chapter 7 trustee for RDI.[22]  The Trustee first became aware of the Committee's Draft Complaint in or around April 2020.[23]

### 3.    The Scottsdale Application

On August 23, 2020, Tad Belshe, an employee of RDI, BMCC, BCC, and SSCC, filled out an application (the "Scottsdale Application") on behalf of BMCC to obtain insurance from Scottsdale.[24]  In the Prior Insurance Information section of the Scottsdale Application, BMCC indicated that it had Employment Practices coverage in the amount of $2 million with Lloyd's, which would expire on September 1, 2020, and that it had Directors and Officers coverage in the amount of $2 million with Lloyd's that were also set to expire on September 1, 2020.[25]  BMCC included a separate page (the "Supplemental Information Page") as part of the Scottsdale Application that stated as follows:

Litigation in a sperate [sic] entity has taken place in the forum of a bankruptcy (Ch 11 reorganization and Ch 7) whereas the managing member of

---

[19]    Joint Statement No. 166; Draft Complaint ¶¶ 21-40.

[20]    Joint Statement Nos. 27, 28, 33, & 34; *see generally* Draft Complaint.

[21]    Joint Statement No. 168.

[22]    *Id.*, No. 8.

[23]    *Id.*, No. 171.

[24]    *Id.*, Nos. 66 & 123; Trustee Motion 9:12-13.

[25]    Joint Statement No. 46.

Beachcomber at Crystal Cove and Shake Shack Crystal Cove is an owner of that separate entity (Ruby's Diner Inc and Ruby's Franchise Systems and several individual Ruby's Diner restaurants located in California.)[26]

BMCC emailed the complete Scottsdale Policy to Arthur J. Gallagher & Co. ("AJG"), the insurance broker for RDI, BMCC, BCC, and SSCC.[27] AJG, in turn, emailed the complete Scottsdale Application to CRC Insurance Company, an independent wholesale insurance broker.[28]

On September 24, 2020, CRC emailed a shortened version of the Scottsdale Application to E-Risk, a wholly-owned subsidiary of Nationwide Insurance.[29] CRC also provided to E-Risk two loss runs[30] relating to the prior policies that RDI and BMCC had with Lloyd's.[31] CRC did not send E-Risk the Supplemental Information Page.[32] Neither of the loss runs that CRC forwarded to E-Risk listed or provided any details about the Draft Complaint.[33] The loss run relating to the Prior Policy stated as follows:

> Please be advised that Beazley [at Lloyd's] is in the process of implementing a system upgrade. As a result, the data captured in this Loss Run is as of 24-Jul-19 and does [not] include any claims received after this date. Should you require further details, please contact Beazley's inbox[.][34]

Neither CRC nor E-Risk contacted Beazley at Lloyd's for an up-to-date loss run.[35]

### 4.    The Scottsdale Policy

Scottsdale issued claims-made-and-reported Business and Management Indemnity Policy number EKS3353648 to BMCC (the "Scottsdale Policy"), effective for the period

---

[26]      *Id.*, No. 50; Joint Exhibits Volume 1, Part A, Ex. 9 199.

[27]      Joint Statement Nos. 123 & 126.

[28]      *Id.*, Nos. 37 & 125.

[29]      *Id.*, Nos. 35 & 125.

[30]      Although the parties do not define this term, it appears that a "loss run" is a report that provides the history of claims made against a business insurance policy. *See Transportation Ins. Co. v. Cent. Nat'l Ins. Co. of Omaha,* 2021 WL 5985566, at *16 (D. Or. Oct. 12, 2021), *report and recommendation adopted by* 2021 WL 5985138 (D. Or. Dec. 16, 2021).

[31]      Joint Statement No. 53.

[32]      *Id.*, No. 182.

[33]      *Id.*, No. 186.

[34]      *Id.*, No. 55.

[35]      *Id.*, Nos. 63 & 64.

from November 1, 2020, to November 1, 2021 (the "Scottsdale Policy Period").[36] The
Scottsdale Policy is not a continuation of the Prior Policy.[37] Subject to certain terms,
conditions, limitations, exclusions, and endorsements, the Scottsdale Policy provides
coverage under a Directors and Officers and Company Coverage Section and an
Employment Practices Coverage Section.[38] In general terms, the Directors and Officers
Coverage Section provides that Scottsdale shall pay the "Loss" of the "Directors and
Officers" or of the "Company" for which the "Directors and Officers" or the
"Company" has become legally obligated to pay by reason of a "Claim" first made
against the "Directors and Officers" or the "Company" during the Scottsdale Policy
Period and reported to Scottsdale in accordance with the Scottsdale Policy's notice and
reporting provisions for any "Wrongful Act" taking place prior to the end of the
Scottsdale Policy Period.[39]

A "Claim" is defined as, among other things, "a civil proceeding against any
Insured seeking monetary damages or non-monetary or injunctive relief, commenced by
the service of a complaint or similar pleading" and "a written demand against any
Insured for monetary damages or non-monetary or injunctive relief."[40] A "Loss" is
defined to include damages, judgments, settlements, pre-judgment or post-judgment
interest, and "Costs, Charges, and Expenses" incurred by Insureds.[41] The Scottsdale
Policy specifically excludes matters uninsurable under the laws pursuant to which the
Scottsdale Policy is construed.[42] The Scottsdale Policy also excludes taxes, fines or
penalties, punitive damages, and exemplary damages.[43] A "Wrongful Act" is defined as
any actual or alleged error, omission, misleading statement, misstatement, neglect, breach
of duty, or act allegedly committed or attempted by any of the "Directors and Officers"

---

[36]      *Id.*, No. 196.

[37]      *Id.*, No. 52.

[38]      *Id.*, No. 197; Joint Exhibits Volume 1, Part B, Ex. 15 291-298 (the "Scottsdale Policy
Employment Practices Coverage Section"); Joint Exhibits Volume 1, Part B, Ex. 15 299-306 (the
"Scottsdale Policy Directors and Officers and Company Coverage Section").

[39]      Joint Statement No. 199; *see generally* Scottsdale Policy Directors and Officers and
Company Coverage Section.

[40]      Joint Statement No. 200; Scottsdale Policy Directors and Officers and Company
Coverage Section 299.

[41]      Joint Statement No. 201; Scottsdale Policy Directors and Officers and Company
Coverage Section 300.

[42]      Joint Statement No. 201; Scottsdale Policy Directors and Officers and Company
Coverage Section 300.

[43]      Joint Statement No. 201; Scottsdale Policy Directors and Officers and Company
Coverage Section 300.

while acting in their capacity as such.[44] "Interrelated Wrongful Acts" are defined to
mean all Wrongful Acts that have as a common nexus any fact, circumstance, situation,
event, transaction, cause or series of facts, circumstances, situations, events, transactions,
or causes.[45]

> The Scottsdale Policy states as follows:
>
> All Claims arising out of the same Wrongful Act and all Interrelated
> Wrongful Acts shall be deemed to be a single Claim and shall be deemed to
> have been made at the earliest of the following times, regardless of whether
> such date is before or during the Policy Period:
>
>> a.    the time at which the earliest Claim involving the same
>> Wrongful Act or Interrelated Wrongful Acts is first made; or
>>
>> b.    the time at which the Claim involving the same
>> Wrongful Act or Interrelated Wrongful Acts shall be deemed to have
>> been made pursuant to Section E.2. below.[46]

The Scottsdale Policy contains a Prior Notice Exclusion that provides that Scottsdale
shall not be liable for Loss on account of any Claim:

> alleging, based upon, arising out of, attributable to, directly or indirectly
> resulting from, in consequence of, or in any way involving:
>
>> a.    any Wrongful Act, fact, circumstance, or situation
>> which has been the subject of any written notice given under any other
>> policy of which this Policy is a renewal or replacement or which it
>> succeeds in time; or
>>
>> b.    any other Wrongful Act, whenever occurring, which
>> together with a Wrongful Act which has been the subject of such
>> notice, would constitute Interrelated Wrongful Acts.[47]

---

[44]    Joint Statement No. 202; Scottsdale Policy Directors and Officers and Company
Coverage Section 300-301.

[45]    Joint Statement No. 203; Scottsdale Policy Directors and Officers and Company
Coverage Section 300.

[46]    Joint Statement No. 204; Scottsdale Policy Directors and Officers and Company
Coverage Section 304.

[47]    Joint Statement No. 205; Scottsdale Policy Directors and Officers and Company
Coverage Section 301.

5.     **The Underlying Action**

On March 11, 2021, the Trustee filed a lawsuit (the "<u>Underlying Action</u>") against the Directors and Officers, BMCC, BCC, SSCC, and others (the "<u>Defendants in the Underlying Action</u>") in the Bankruptcy Court.[48]  In the Underlying Action, the Trustee alleged that the Defendants in the Underlying Action used RDI funds and personnel to prop up other entities, including BMCC, BCC, and SSCC, by paying salaries, sharing insurance policies, paying messenger fees, and loaning amounts in excess of $600,000 to the Beachcomber Cafe.[49]

The Amended Complaint in the Underlying Action is summarized as follows:[50]

More than 20 paragraphs are dedicated to allegations detailing how Cavanaugh and Kosmides usurped the opportunity to own and operate the Crystal Cove Restaurants.[51] Cavanaugh and Kosmides breached their fiduciary duties to RDI and its creditors by engaging in misconduct including, but not limited to, devoting and transferring RDI financial resources, personnel, and assets to operate other restaurants, including Beachcomber and Shake Shack, and devoting a significant portion of their time, energy, and resources to the operation of the Non-Debtor Entities, to the detriment and negligence of their duties at RDI.[52]  Cavanaugh and Kosmides breached their fiduciary duties to RDI and its creditors by engaging in misconduct, including making improper distributions to themselves.[53]  On or around July 25, 2018, less than two months before RDI filed its bankruptcy petition, Cavanaugh and Kosmides caused RDI to alter its books to recharacterize $1,529,991.45 of the Personal Loans as capital distributions and to "zero out" thousands of dollars in additional outstanding shareholder loans and interest; Cavanaugh and Kosmides purported to backdate those alterations to January 2, 2017; and Cavanaugh and Kosmides knew that RDI was insolvent and that they planned to file a bankruptcy petition.[54]  Cavanaugh and Kosmides breached their fiduciary duties by granting themselves personal loans and salary advances in a manner that was not in the best interest of, and that damaged, RDI and its creditors and by failing to repay their debts to the Company—even attempting to hide those debts and to mischaracterize them as

---

[48]     Joint Statement No. 208.

[49]     *Id.*, No. 108.

[50]     Joint Exhibits Volume 1, Part B, Ex. 20 640-685 (the "<u>Amended Complaint in Underlying Action</u>").

[51]     Joint Statement No. 90; *see generally* Amended Complaint in Underlying Action.

[52]     Joint Statement No. 213; Amended Complaint in Underlying Action ¶ 121.

[53]     Joint Statement No. 214; Amended Complaint in Underlying Action ¶ 121.

[54]     Joint Statement No. 215; Amended Complaint in Underlying Action ¶¶ 112 & 114.

distributions.[55]  Cavanaugh and Kosmides caused RDI to make transfers of company
property to themselves, or for their benefit, and for other purposes that were not in the
best interest of RDI and that damaged RDI and its creditors.[56]

The Trustee asserted the following causes of action in the Amended Complaint in
the Underlying Action:

- breach of fiduciary duty against the Directors and Officers;
- aiding and abetting breach of fiduciary duties against BMCC, BCC, SSCC, and others;
- avoidance of actually fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A) against the Directors and Officers;
- avoidance of constructively transfers pursuant to 11 U.S.C. § 548(a)(1)(B) against the Directors and Officers;
- recovery of fraudulent transfers pursuant to 11 U.S.C. §§ 550 and 551 against all defendants;
- avoidance and recovery of actually fraudulent transfers pursuant to 11 U.S.C. §§ 544 and Cal. Civ. Code § 3439.04 against all defendants;
- avoidance and recovery of constructively fraudulent transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code § 3439.05 against all defendants;
- recovery of illegal dividends under Cal. Corp. Code §§ 500, 501, & 506 against the Directors and Officers;
- equitable subordination of claims pursuant to 11 U.S.C. § 510(c) against all defendants;
- permanent injunction pursuant to Cal. Civ. Code § 3439.07(a)(3)(A) against all defendants;
- permanent injunction pursuant to Cal. Civ. Code § 3439.07(a)(3)(C) against all defendants;
- breach of contract against the Directors and Officers;
- money lent against the Directors and Officers;
- open book account against the Directors and Officers;
- violation of Cal. Penal Code § 496(c) against all defendants;
- accounting against all defendants;
- constructive trust against all defendants; and
- misappropriation of trade secrets against all defendants.[57]

---

[55]    Joint Statement No. 216; Amended Complaint in Underlying Action ¶ 121.

[56]    Joint Statement No. 217; Amended Complaint in Underlying Action ¶¶ 132 & 133.

[57]    Joint Statement No. 218.

In the Underlying Action, the Trustee seeks compensatory and exemplary damages; the recovery of all fraudulent transfers; the amount of the improper distributions to the Directors and Officers; equitable relief; treble damages; punitive damages; interest; a constructive trust; and attorneys' fees and costs.[58]

On March 18, 2021, BMCC tendered the Underlying Action to Scottsdale for coverage under the Scottsdale Policy and to Lloyd's for coverage under the Prior Policy.[59] Lloyd's accepted coverage for the Underlying Action subject to a reservation of rights.[60]

### 6.    Coverage Denied by Scottsdale

Aaron Klass, Scottsdale's claims adjuster, began reviewing the claim on March 22, 2021.[61] As of April 6, 2021, Klass was aware that another Director and Officer insurer was providing a defense to Kosmides and Cavanaugh.[62] Klass received the Draft Complaint on April 22, 2021, at 10:42 a.m.[63] At 12:18 p.m. that same day, Klass wrote in his notes: "At this point, I believe that we have sufficient information to conclude our initial coverage review," and he planned to deny coverage.[64]

On May 3, 2021, counsel for Scottsdale sent a letter to counsel for the Insureds, stating that there was no coverage for the Underlying Action under the Scottsdale Policy.[65]

### 7.    Settlement

The parties participated in mediation, and on December 17, 2021, they reached a settlement in principle.[66] The parties executed a Settlement Agreement on March 28, 2022,[67] through which the Trustee received $3.35 million from Lloyd's; $50,000 from

---

[58]    Joint Statement No. 219; Amended Complaint in Underlying Action 683-684.

[59]    Joint Statement Nos. 109 & 209.

[60]    *Id.*, No. 211.

[61]    *Id.*, No. 128.

[62]    *Id.*, No. 77.

[63]    *Id.*, No. 82.

[64]    *Id.*, Nos. 87 & 88.

[65]    *Id.*, No. 231.

[66]    *Id.*, No. 132.

[67]    *Id.*, No. 133.

non-party Lighthouse Cafe, LLC; $80,000 from SSCC; and $70,000 from BCC.[68]  BCC
and SSCC stipulated to a $20 million judgment against them in the Underlying Action.[69]

## B.    Procedural History

In July 2022, Scottsdale filed its Complaint in this Court against BCC, SSCC,
BMCC, Cavanaugh, and Kosmides.[70]  In its Complaint, Scottsdale seeks declaratory
judgment on three issues:  (1) that the Prior Notice Exclusion bars coverage for the
Underlying Action under the Scottsdale Policy; (2) that the Underlying Action does not
constitute a Claim that was first made during the Scottsdale Policy Period; and (3) that
the Warranty Exclusion bars coverage for the Underlying Action under the Scottsdale
Policy.[71]

The Trustee intervened and filed a Counterclaim against Scottsdale in December
2022.[72]  The Trustee asserted claims for relief for breach of contract and for breach of the
implied covenant of good faith and fair dealing.[73]

Scottsdale and the Trustee filed simultaneous cross-motions for summary
judgment in November 2023,[74] and they are fully briefed.  The Court conducted a hearing
on the motions in December 2023.[75]

## III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any
material fact and the moving party is entitled to judgment as a matter of law.  *See*
Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court
construes the evidence in the light most favorable to the non-moving party.  *See Barlow v.*

---

[68]    *Id.*, Nos. 134 & 135.

[69]    *Id.*, No. 136.

[70]    *See* Complaint.

[71]    *Id.* at ¶¶ 42-50.

[72]    Trustee's Mot. to Intervene as Cross-Plaintiff in his Capacity as Chapter 7 Trustee of
RDI and Assignee of Claims [ECF No. 31]; Counterclaim.  The Trustee characterized his
pleading as a "Cross-Complaint," but, because the Trustee effectively stepped into the shoes of
Defendants BCC and SSCC and asserted claims for relief against Plaintiff Scottsdale, the Court
regards the Trustee's pleading as a Counterclaim.  *See generally* Fed. R. Civ. P. 7(a) & 13(a).

[73]    Counterclaim ¶¶ 93-112.

[74]    Scottsdale did not move on its third claim for relief.  *See* Trustee Opposition 11 n.4.

[75]    *See* Text Entry Minute Order [ECF No. 56].

*Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). The substantive law determines the facts that are material. *See id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Factual disputes that are "irrelevant or unnecessary" are not counted. *Id.* A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Under this standard, the moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *See id.* at 325. Instead, the moving party need prove only that there is an absence of evidence to support the nonmoving party's case. *See id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *See Celotex*, 477 U.S. at 324. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252). The non-moving party must make this showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252.

Furthermore, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Advisory Committee Notes, 2010 Amendment, to Fed. R. Civ. P. 56. Reports and declarations in support of an opposition to summary judgment may be considered only if they comply with Rule 56(c), which requires that they "be made on personal knowledge, set forth facts that would be admissible evidence, and show affirmatively that the declarant is competent to testify to the matters stated therein." *Nadler v. Nature's Way Prod., LLC*, 2015 WL 12791504, at *1 (C.D. Cal. Jan. 30, 2015); *see also Loomis v. Cornish*, 836 F.3d 991, 996–97

(9th Cir. 2016) (noting that hearsay statements do not enter into the analysis on summary judgment).

## IV.  ANALYSIS

### A.    Legal Framework

"An insurance policy is, fundamentally, a contract between the insurer and the insured." *LaBarbera v. Sec. Nat'l Ins. Co.*, 86 Cal. App. 5th 1329, 1340 (2022) (citation omitted).  The insurer makes promises and the insured pays premiums, "one in consideration of the other, against the risk of loss." *Pac. Bay Masonry, Inc. v. Navigators Specialty Ins. Co.*, 561 F. Supp. 3d 881, 885 (N.D. Cal. 2021).

The "interpretation of policy language is a question of law." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 641, *as modified on denial of reh'g* (2003).  "In construing the language of an insurance policy, a court should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 218 (1980).

The insured has the burden to establish that its claim is within the basic scope of insurance coverage.  *See Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998). Once the insured has made this showing, then the insurer bears the burden to prove that the claim is specifically excluded.  *See id.*  "When an insurer seeks summary judgment 'on the ground the claim is excluded,' the insurer has the burden 'to prove that the claim falls within an exclusion.'"  *Imperium Ins. Co. v. Unigard Ins. Co.*, 16 F. Supp. 3d 1104, 1115 (E.D. Cal. 2014) (citing *Roberts v. Assurance Co. of America*, 163 Cal. App. 4th 1398, 1406 (2008)).

An insurer has a duty to defend an insured if it becomes aware of "facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995).  The duty to defend is broader than the duty to indemnify. *See Buss v. Superior Court*, 16 Cal. 4th 35, 46 (1997).  For example, in a mixed action, when some claims are at least potentially covered and others are not, the insurer has a "duty to defend the entire 'mixed' action prophylactically, as an obligation imposed by law in support of the policy." *Id.* at 48-49; *see also Seagate Tech. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 737 F. Supp. 2d 1013, 1016 (N.D. Cal. 2010).  Still, the insurer's duty to defend "is not unlimited; it is measured by the nature and kinds of risks covered by the policy." *Waller*, 11 Cal. 4th at 19.  "[W]here there is no possibility of coverage, there is no duty to defend." *Id.* (citation omitted).

Exclusionary language in the insurance policy "must be plain, clear, and conspicuous." *ML Direct, Inc. v. TIG Specialty Ins. Co.*, 79 Cal. App. 4th 137, 141 (2000). An "insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004) (internal quotation marks and citation omitted). Conspicuousness "refers to how a coverage-limiting provision actually has been positioned and printed within the policy at issue." *Id.* at 1209. The exclusion "must be placed and printed so that it will attract the reader's attention." *Id.* at 1204. "Some relevant considerations include the location of where the exclusion appears in the policy, the exclusion's relation to the density of the entire policy, and whether the exclusion appears in any table of contents." *Northfield Ins. Co. v. Sandy's Place, LLC*, 530 F. Supp. 3d 952, 964 (E.D. Cal. 2021).

An exclusion is plain and clear if it is "stated precisely and understandably, in words that are part of the working vocabulary of the average layperson." *Dominguez v. Fin. Indem. Co.*, 183 Cal. App. 4th 388, 396 (2010) (citing *Haynes*, 32 Cal. 4th at 1204). Courts "find limiting language to not be plain and clear where the provision is ambiguous, the provision uses complicated words not within the knowledge of average lay persons, or where the language is 'confusing.'" *Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 910 (N.D. Cal. 2016) (citing *Haynes*, 32 Cal. 4th at 1211 (collecting cases)). "Ambiguities are construed against the insurer." *Madera Grp., LLC v. Mitsui Sumitomo Ins. USA, Inc.*, 545 F. Supp. 3d 820, 834 (C.D. Cal. 2021). "However, 'when the terms of the policy are plain and explicit, the courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed.'" *Id.* (citing *First Am. Title Ins. v. XWarehouse Lending Corp.*, 177 Cal. App. 4th 106, 115 (2009)).

## B.    The Scottsdale Claims

### 1.    Declaratory Judgment Regarding the Prior Notice Exclusion

Scottsdale argues that its prior notice exclusion bars coverage for the Underlying Action under the Scottsdale Policy.[76] A "prior notice exclusion states that the policy does not provide coverage for claims that are broadly related to claims that were noticed during a prior policy period." *XL Specialty Ins. Co. v. Perry*, 2012 WL 3095331, at *7 (C.D. Cal. June 27, 2012).

The Court first evaluates whether the language of the prior notice exclusion is plain, clear, and conspicuous. *See Coregis Ins. Co. v. Camico Mut. Ins. Co.*, 959 F. Supp. 1213, 1221 (C.D. Cal. 1997). As an initial matter, the Court notes that the Trustee does

---

[76]    Scottsdale Motion 16:3-24:10.

not argue that the prior notice exclusion is ambiguous.[77]  The prior notice exclusion appears in a separate section, under the heading "EXCLUSIONS."[78]  Other courts have concluded that the language used in the prior notice exclusion—"based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving"—is clear, conspicuous, and unambiguous.  *See, e.g., Tricor Am., Inc. v. Illinois Union Ins. Co.*, 351 F. App'x 225, 227 (9th Cir. 2009) (concluding that this language "is plainly intended broadly to exclude coverage"); *GGIS Ins. Servs., Inc. v. Superior Ct.*, 168 Cal. App. 4th 1493, 1508 (2008) (concluding that an exclusion that contained this language "clearly and conspicuously precludes coverage").  Accordingly, the Court concludes that the prior notice exclusion is plain, clear, and conspicuous.

Second, the Court determines whether this exclusion prevents, as a matter of law, a finding of a potential for coverage for the Trustee's claims.  *See Coregis Ins. Co.*, 959 F. Supp. at 1221.  Other courts have found the language in the prior notice exclusion to be broad and far-reaching in scope.  *See, e.g., Landmark Am. Ins. Co. v. Navigators Ins. Co.*, 354 F. Supp. 3d 1078, 1082 (N.D. Cal. 2018) (noting that "'in any way involving' is the broadest" standard); *Columbia Cas. Co. v. Abdou*, 2015 WL 9244305, at *3 (S.D. Cal. Dec. 16, 2015) (citing *Nat'l Bank of California v. Progressive Cas. Ins. Co.*, 938 F. Supp. 2d 919, 931 (C.D. Cal. 2013)) (concluding that "the phrase 'in any way involving' is 'language that would only be included to maximally expand the enumerated categories of acts' that are excluded from coverage"); *Aloha Pac., Inc. v. California Ins. Guarantee Ass'n*, 79 Cal. App. 4th 297, 319 (2000) (citation omitted) (concluding that "arising out of" is language that "broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship").

The Draft Complaint asserts causes of action against Cavanaugh and Kosmides for breaches of fiduciary duty, alleging that Cavanaugh and Kosmides did not act in the best interest of RDI when they entered into business arrangements that were not on arm's-length terms and caused RDI to make distributions to themselves or for their benefit.[79]  The Underlying Action involves similar causes of action against Cavanaugh and Kosmides.[80]

The Underlying Action includes additional allegations that do not appear in the Draft Complaint.  For example, the pleading in the Underlying Action explicitly asserts

---

[77]     *See generally* Scottsdale Opposition.

[78]     Scottsdale Policy Directors and Officers and Company Coverage Section 301.

[79]     Joint Statement Nos. 18, 22, & 160; *see generally* Draft Complaint.

[80]     Joint Statement Nos. 214, 216-217; *see generally* Amended Complaint in Underlying Action.

that Cavanaugh and Kosmides usurped a corporate opportunity.[81]  The Underlying Action also contains claims against BMCC, BCC, and SSCC.  Notwithstanding the differences between the Underlying Action and the Draft Complaint, their existence does not bar the application of the prior notice exclusion.  The Underlying Action "in any way involve[es]" the Draft Complaint.  In large part, the claims in the Underlying Action expand on the allegations in the Draft Complaint regarding Cavanaugh and Kosmides's alleged breach of fiduciary duty.  Because the prior notice exclusion broadly incorporates wrongful acts that "in any way involve" the prior noticed claim, even the "additional allegations not implicated by or spelled out in the" Draft Complaint are barred under the exclusion.  *See Landmark Am. Ins. Co.*, 354 F. Supp. 3d at 1083.  The clear, plain, and conspicuous language of the prior notice exclusion in the Scottsdale Policy is "included to maximally expand the enumerated categories of acts that are excluded from coverage[.]" *Columbia Cas. Co.*, 2015 WL 9244305, at *3 (internal quotation marks and citation omitted).  The Court concludes that the Underlying Action is excluded from coverage because it "in any way involve[es]" a wrongful act that was noticed under the Prior Policy.

The Trustee argues that *Marcus & Millichap Real Est. Inv. Servs., Inc. v. Indian Harbor Ins. Co.*, 2009 WL 10676206 (C.D. Cal. Dec. 17, 2009), is "on point."[82]  The *Marcus & Millichap* court concluded that the prior notice exclusion did not apply and that the insurer's attempt in that case "to draw a common thread between potentially unrelated transactions" did not relieve the insurer of its duty to defend.  *Id.* at *4.  But, as Scottsdale argues, the prior notice exclusion language in that case did not include the phrase "in any way involving."[83]  Therefore, *Marcus & Millichap* is distinguishable from the instant case.

The Trustee also relies on *Opus Bank v. Liberty Ins. Underwriters, Inc.*, 2013 WL 11037456, at *5 (C.D. Cal. June 26, 2013), *aff'd*, 621 F. App'x 405 (9th Cir. 2015).  But, as Scottsdale argued during the hearing, that case is distinguishable because the policy in *Opus Bank* did not contain the same broad language of "in any way involving" and *Opus Bank* concerned a prior acts exclusion, not a prior notice exclusion.  *See generally id.*

The Trustee further relies on *Domokos v. Scottsdale Ins. Co.*, 2020 WL 4016811 (N.D. Cal. July 16, 2020).  However, in *Domokos*, Scottsdale declined coverage under the "Prior and Interrelated Wrongful Acts Exclusion," not under a prior notice exclusion. *See id.* at 2; *see also XL Specialty Ins. Co.*, 2012 WL 3095331, at *7 (noting the "subtle"

---

[81]    Joint Statement Nos. 27, 28, 33, & 34.

[82]    Scottsdale Opposition 16:1.

[83]    Scottsdale Reply 4:1-12.

difference between the Interrelated Wrongful Acts limitation and the prior notice
exclusion).

Accordingly, the Court concludes that the prior notice exclusion applies and that it
absolves Scottsdale from the obligation to defend against the Underlying Action. The
language of the prior notice exclusion is plain, clear, and conspicuous. Moreover, the
prior notice exclusion in the Scottsdale Policy mandates the conclusion that the
Underlying Action "in any way involve[es]" a wrongful act that was noticed in the Draft
Complaint. Although the Underlying Action includes allegations that are not present in
the Draft Complaint, the allegations are similar, involving the same overall nexus of facts
and law, and, at minimum, having an incidental relationship to the allegations in the Draft
Complaint. Because the prior notice exclusion is plain and explicit in its exclusion of prior
noticed actions, the Court declines to "indulge in a forced construction so as to fasten a
liability on the insurance company which it has not assumed." *Madera Grp., LLC*, 545
F. Supp. 3d at 834 (citing *First Am. Title Ins.*, 177 Cal. App. 4th at 115).

Accordingly, the Scottsdale Motion regarding its Declaratory Judgment claim with
respect to Prior Notice Exclusion is **GRANTED**. The Trustee Motion with respect to
that claim is **DENIED.**

### 2.    Declaratory Judgment Regarding a Single Claim First Made Prior to Scottsdale Policy Period

Scottsdale also argues that there is no coverage for the Underlying Action under
the Scottsdale Policy because the Underlying Action does not constitute a Claim first
made during the Scottsdale Policy Period.[84]

Under a claims-made policy, the insurer promises to "assume liability for any
errors, including those made prior to the inception of the policy as long as a claim is made
during the policy period." *Pacific Employers Ins. Co. v. Superior Court*, 221 Cal. App. 3d
1348, 1356-57 (citations omitted). A claims-made-and-reported policy limits coverage to
claims both made against the insured, and reported to the company, within the policy
period. *See Pension Tr. Fund for Operating Engineers v. Fed. Ins. Co.*, 307 F.3d 944, 955
(9th Cir. 2002); *KPFF, Inc. v. California Union Ins. Co.*, 56 Cal. App. 4th 963, 968 (1997).

As noted, the Scottsdale Policy states that all Claims arising out of the same
Wrongful Act and all Interrelated Wrongful Acts shall be deemed to be a single Claim,
and such Claim shall be deemed to have been made at the earliest of the following times,
regardless of whether such date is before or during the Scottsdale Policy Period: (a) the
time at which the earliest Claim involving the same Wrongful Act or Interrelated

---

[84]    Scottsdale Motion 24:11-26:10.

Wrongful Act is first made; or (b) the time at which the Claim involving the same
Wrongful Act or Interrelated Wrongful Acts shall be deemed pursuant to Section E(2) of
the Scottsdale Policy.[85]  The Scottsdale Policy defines "Interrelated Wrongful Acts" as
all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event,
transaction, cause or series of facts, circumstances, situations, events, transactions or
causes.[86]  The Court concludes that the language of the Interrelated Wrongful Acts
limitation is unambiguous, and it will therefore give the clauses their plain and ordinary
meaning.  *See XL Specialty Ins. Co.*, 2012 WL 3095331, at *6 (concluding that much of this
same language is unambiguous and, therefore, giving the clauses their plain and ordinary
meaning).

The insured must make "a prima facie showing" that "the underlying action fell
within coverage provisions."  *Maryland Cas. Co. v. Nat'l Am. Ins. Co.*, 48 Cal. App. 4th
1822, 1832 (1996).  Here, the Trustee asserts that the claims "for usurpation of corporate
opportunity—particularly, those for aiding and abetting against BCC and SSCC" were
first made during the Scottsdale Policy Period.[87]  The undisputed evidence shows that the
Draft Complaint did not use the words "corporate opportunity"; it did not include
allegations that the opportunity to own and operate the Crystal Cove Restaurants was a
corporate opportunity that belonged to RDI; and it did not include allegations regarding
how the opportunity to own and operate the Crystal Cove Restaurants arose.[88]
Accordingly, the Court concludes that the Trustee has made a *prima facie* showing of
potential coverage.

Scottsdale argues that the Underlying Action arises out of the same Wrongful Acts
or Interrelated Wrongful Acts.[89]  Scottsdale "must establish *the absence of any such
potential* [for coverage].  In other words, the insured need only show that the underlying
claim *may* fall within policy coverage; the insurer must prove it *cannot*."  *Montrose Chem.
Corp. v. Superior Ct.*, 6 Cal. 4th 287, 300 (1993) (emphasis in original).

"The interrelated wrongful acts limitation states that claims that fall within the
scope of 'interrelated wrongful acts' will be deemed to have been made at the time the
first claim was made."  *XL Specialty Ins. Co.*, 2012 WL 3095331, at *7.  "'Related' is a
broad word" that "encompasses both logical and causal connections."  *Bay Cities Paving*

---

[85]     Joint Statement No. 204; Scottsdale Policy Directors and Officers and Company
Coverage Section 304.

[86]     Joint Statement No. 203; Scottsdale Policy Directors and Officers and Company
Coverage Section 300.

[87]     Scottsdale Opposition 22:4-5.

[88]     Joint Statement Nos. 27, 28, 33, & 34.

[89]     Scottsdale Motion 24:25-27.

*& Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 873 (1993). However, "the relationship between two claims, though perhaps 'logical,'" must not become "so attenuated or unusual that an objectively reasonable insured could not have expected that they would be treated as a single claim under the policy." *Id.*; *compare XL Specialty Ins. Co.*, 2012 WL 3095331, at *8 (concluding that underlying actions from multiple plaintiffs were related when the actions were based upon the defendant's policy of issuing high-risk mortgages), and *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely L. Corp.*, 162 F. Supp. 3d 1068, 1078 (C.D. Cal. 2016), *aff'd*, 708 F. App'x 374 (9th Cir. 2017) (concluding that underlying actions brought by multiple plaintiffs were related because they all arise from a single course of conduct), *with Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*, 506 F.3d 922, 925 (9th Cir. 2007) (concluding that claims brought by "unrelated investors, with unique investment objectives [who] were advised at separate meetings on separate dates, according to their unique financial positions" were not sufficiently related as to constitute a single claim). The "interrelated acts exclusion is 'narrowly interpreted to preserve coverage wherever possible.'" *Domokos*, 2020 WL 4016811, at *6 (citing H. Walter Croskey et al., CALIFORNIA PRACTICE GUIDE: INSURANCE LITIGATION ¶ 7:82.3 (2019)).

After considering the applicable law and the relevant undisputed evidence, the Court concludes that the Underlying Action is sufficiently related to the Draft Complaint as to constitute a single claim. The Draft Complaint alleges that Cavanaugh and Kosmides wrongfully failed to perform their fiduciary duties to RDI.[90] Some allegations in the Draft Complaint are directly reproduced in the Amended Complaint in the Underlying Action.[91] It is undisputed that the Underlying Action contains allegations not raised in the Draft Complaint and that it asserts claims against defendants who are not named in the Draft Complaint.[92] But those differences do not bar the application of the Interrelated Wrongful Acts limitation.

The Interrelated Wrongful Acts limitation in the Scottsdale Policy applies to "all Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts."[93] "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating

---

[90]    Draft Complaint ¶ 19.

[91]    *Compare* Joint Statement Nos. 160 & 161, *with* Joint Statement No. 214.

[92]    *See id.*, Nos. 27, 28, 33, & 34.

[93]    Joint Statement No. 204; Scottsdale Policy Directors and Officers and Company Coverage Section 304.

liability, and connotes only a minimal causal connection or incidental relationship."
*Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819, 830 (2006) (citation omitted).  The
additional allegations in the Amended Complaint in the Underlying Action unmistakably
have an incidental relationship to the allegations in the Draft Complaint.  The Amended
Complaint in the Underlying Action alleges that Cavanaugh and Kosmides:

> breached their fiduciary duties to RDI and its creditors by engaging in
> misconduct including, but not limited to . . . [u]surping the corporate
> opportunity to own and manage The Beachcomber at Crystal Cove
> restaurant; [u]surping the corporate opportunity to own The Shake Shack at
> Crystal Cove restaurant; [u]surping the opportunity to extend the lease in the
> Sub-SubConcession Agreement; [and] [u]surping the corporate opportunity
> to own and manage the Lighthouse Cafe.[94]

While the Draft Complaint generally alleges "Cavanaugh and Kosmides' breaches of
their fiduciary duties to RDI and its creditors,"[95] the Underlying Action expands upon
those allegations by providing additional examples of Cavanaugh and Kosmides's
breaches of fiduciary duty.[96]  Thus, those additional allegations in the Underlying Action
are sufficiently related to the Draft Complaint.  Moreover, even though the Amended
Complaint in the Underlying Action names BMCC, BCC, and SSCC as defendants—
while those entities are not named in the Draft Complaint—the Court still concludes that
the claims are sufficiently related because they arise from a common nexus of similar
facts, circumstances, situations, events, transactions, and causes.[97]

The *Domokos* case is distinguishable.  The *Domokos* court concluded that
Scottsdale's Interrelated Wrongful Acts exclusion did not preclude coverage when the
alleged statements and actions occurred outside of the relevant policy period and included
substantially different allegations.  *See Domokos*, 2020 WL 4016811, at *6-*7.  Here, the
Court concludes that the Underlying Action is sufficiently related to the Draft Complaint
as to constitute a single claim made before the Scottsdale Policy Period because the

---

[94]    Amended Complaint Underlying Action ¶ 121.

[95]    Draft Complaint ¶ 20.

[96]    "[C]orporate directors owe a fiduciary duty to the corporation and its shareholders" to
"act with honesty, loyalty, and good faith."  *Berg & Berg Enterprises, LLC v. Boyle*, 178
Cal. App. 4th 1020, 1037 (2009).  "Based on the duty of loyalty, the corporate opportunity
doctrine provides that a corporate fiduciary, such as a director, officer, or controlling
shareholder, may not usurp the corporation's business opportunities without proper consent."
*United States v. Rodrigues*, 229 F.3d 842, 846 (9th Cir. 2000).

[97]    Joint Statement Nos. 14 & 15; Scottsdale Motion 24:25-25:1.

additional allegations and named defendants in the Underlying Action all arise out of a
common nexus of facts, circumstances, situations, events, transactions, and causes.

Accordingly, the Scottsdale Motion regarding its Declaratory Judgment claim with
respect to Single Claim First Made Prior to Scottsdale Policy Period is **GRANTED**. The
Trustee Motion with respect to that claim is **DENIED**.

### 3.    Declaratory Judgment Regarding the Warranty Exclusion

The Trustee moves for summary judgment on Scottsdale's warranty exclusion
claim.[98] Scottsdale opposes, in part arguing that the Underlying Action arises from and
involves the Draft Complaint.[99] Because the Court concludes that the Amended
Complaint in the Underlying Action arises from and "in any way involve[es]" the Draft
Complaint, the Court **DENIES** the Trustee Motion on that ground. In view of that
ruling, the Court finds it unnecessary to reach any other arguments regarding the
warranty exclusion.

### C.    The Trustee Claims

### 1.    Breach of Contract/Duty to Defend

The Trustee argues that Scottsdale breached its duty to defend its insureds.[100]
Scottsdale responds that it did not have a duty to defend because the Underlying Action
did not seek a Covered Loss, as that term is defined in the Scottsdale Policy.[101] The
undisputed evidence shows that, in the Underlying Action, the remedies that the Trustee
sought include compensatory and exemplary damages; the recovery of all fraudulent
transfers; the recovery of the amount of the improper distributions to the Directors and
Officers; equitable relief; treble damages; punitive damages; interest; a constructive trust;
and attorneys' fees and costs.[102] In clear, plain, and conspicuous language, the Scottsdale
Policy excludes punitive damages; exemplary damages; taxes; fines; and matters
uninsurable under the laws pursuant to which the Scottsdale Policy is construed.[103]
California "public policy prohibits the payment of punitive damage awards by the
insurer." *Peterson v. Superior Ct.*, 31 Cal. 3d 147, 157 (1982). Further, it is "well
established" under California law "that one may not insure against the risk of being

---

[98]    Scottsdale Motion 26:1-28:11.

[99]    Trustee Opposition 13:15-16.

[100]   Trustee Motion 18:24-29:8.

[101]   Scottsdale Motion 26:11-28:6.

[102]   Joint Statement No. 219.

[103]   *Id.*, No. 201.

ordered to return money or property that has been wrongfully acquired." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1266 (1992). Accordingly, to the extent that the Underlying Action seeks the recovery of punitive damages or the return of money or property that has been wrongfully acquired, the Underlying Action does not seek a Covered Loss as the term is defined in the Scottsdale Policy.

The Trustee argues that the Underlying Action "also sought compensatory damages, including for the aiding and abetting usurpation of corporate opportunity claim."[104] The Trustee asserts that, even if "some of the losses" in the Underlying Action "might not be covered losses," Scottsdale has not "negat[ed] all facts suggesting the possibility of coverage."[105] Scottsdale responds that "the damages that the Trustee sought for those allegations was, nonetheless, still for the disgorgement of or the return of the benefit conferred upon the various entities when they allegedly usurped the corporate opportunities belonging to RDI."[106]

"In deciding whether a certain remedy is insurable, [the Court] must look beyond the labels of the asserted claims or remedies." *Pan Pac. Retail Properties, Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 966 (9th Cir. 2006). The fundamental distinction between what is insurable and what is not depends upon "whether the claim seeks to recover only the money or property that the insured wrongfully acquired." *Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006).

The "nature of the facts and the claim would certainly be impactful" to analyze whether the loss is insurable. *Dobson v. Twin City Fire Ins. Co.*, 2015 WL 12698443, at *10 (C.D. Cal. Aug. 5, 2015). Accordingly, the Court analyzes the facts and claims alleged in the Amended Complaint in the Underlying Action.

Generally, the Amended Complaint alleges that Cavanaugh and Kosmides breached their fiduciary duties to RDI by usurping opportunities and benefitting themselves to the detriment of RDI.[107]

- In its first and second claims, the Amended Complaint alleges that "Cavanaugh and Kosmides caused damages to RDI in excess of $35 million, plus prejudgment interest," and that punitive damages should be awarded "to punish said defendants and deter future conduct of this type."[108]

---

[104]    Scottsdale Opposition 23:4-6.

[105]    *Id.* at 23:16-18.

[106]    Scottsdale Reply 7:24-27.

[107]    *See generally* Amended Complaint in Underlying Action.

[108]    *Id.* at ¶¶ 122, 123, 126, & 130.

- In its third, fourth, sixth, and seventh claims, the Amended Complaint alleges that the "Transferred Assets should have, and would have, been property of the RDI Estate, and the debts were incurred against property that should have, or would have, been property of the RDI Estate."[109]  The Amended Complaint alleges that the "transfers are believed to be an amount in excess of $35 million, subject to proof."[110]

- In its fifth claim, the Amended Complaint alleges that "RDI has a right to the transferred property itself—including ownership and management of the Beachcomber, Shake Shack, and Lighthouse restaurants, including all LLC interests, and to the lease extension in the Sub-SubConcession Agreement—and all such property should be held in constructive trust."[111]

- In its eighth claim, the Amended Complaint alleges that Cavanaugh and Kosmides wrongfully caused RDI to make shareholder distributions to themselves or for their personal benefit.[112]

- In its ninth claim, the Amended Complaint alleges that Cavanaugh and Kosmides's "inequitable conduct has resulted in harm to RDI, its creditors and the RDI Debtors' Estates in that RDI's general unsecured creditors are less likely to recover the full amounts owed to them because of Cavanaugh and Kosmides' wrongful conduct" and, therefore, that the claims of Cavanaugh, Kosmides, and the Non-Debtor Entitles should be equitably subordinated against the RDI Debtors' Estates.[113]

- In its tenth claim, the Amended Complaint asserts that "the Court should permanently enjoin Defendants from directly or indirectly transferring, selling, assigning, pledging, hypothecating, encumbering, dissipating, distributing or moving the Transferred Assets of the RDI Estates."[114]

- In its eleventh claim, the Amended Complaint asserts that "the Court should permanently enjoin Defendants from directly or indirectly transferring, selling, assigning, pledging, hypothecating, encumbering, dissipating, distributing or moving their own personal assets, except as necessary in the ordinary course of business or to fulfill normal living expenses, until judgment in this proceeding has been satisfied."[115]

---

[109]    *Id.* at ¶¶ 133, 144, 154, & 168.

[110]    *Id.* at ¶¶ 141 & 148.

[111]    *Id.* at ¶ 150.

[112]    *Id.* at ¶ 176.

[113]    *Id.* at ¶¶ 180 & 182.

[114]    *Id.* at ¶ 185.

[115]    *Id.* at ¶ 188.

- In its twelfth claim, the Amended Complaint alleges that Cavanaugh and Kosmides failed to repay salary advances, loans, and interest due to RDI under the agreements for Personal Loans and that Cavanaugh and Kosmides purported to discharge the Personal Loans.[116]  The Amended Complaint asserts that Cavanaugh and Kosmides's purported discharge "is voidable and these monies remain due and owing."[117]

- In its thirteenth claim, "the Trustee seeks damages in an amount to be proven at trial for the Personal Loans" and asserts that RDI is entitled to prejudgment interest.[118]

- In its fourteenth claim, the Amended Complaint alleges that "Cavanaugh and Kosmides have not repaid the Personal Loans" and that RDI is entitled to prejudgment interest.[119]

- In its fifteenth claim, the Amended Complaint alleges that Cavanaugh and Kosmides stole and withheld the Transferred Assets, which caused damage to RDI Debtors' Estates.[120]  The Amended Complaint asserts that "RDI Debtors' Estates are entitled to three times the amount of their actual damages, plus costs and attorneys' fees."[121]

- In its sixteenth claim, the Amended Complaint alleges that funds and assets were intermingled and that a "full and complete accounting is therefore necessary to determine the amount of money, assets and property belonging to RDI and owed respectively to RDI by each Defendant."[122]

- In its seventeenth claim, the Amended Complaint asserts that the "Court should impose a constructive trust over all property fraudulently transferred or business opportunities usurped by RDI.  This constructive trust necessarily includes ownership and management of the Beachcomber, Shake Shack, and Lighthouse restaurants."[123]

- Finally, in its eighteenth claim, the Amended Complaint alleges that Defendants have been "unjustly enriched" by misappropriating "trade secrets to develop and

---

[116]    *Id.* at ¶¶ 192 & 193.

[117]    *Id.* at ¶ 193.

[118]    *Id.* at ¶¶ 198 & 199.

[119]    *Id.* at ¶¶ 203 & 204.

[120]    *Id.* at ¶¶ 208-210.

[121]    *Id.* at ¶ 211.

[122]    *Id.* at ¶¶ 213 & 214.

[123]    *Id.* at ¶ 216.

run competing restaurants including Beachcomber, Shake Shack, and Lighthouse"
and that "the Estate is entitled to recover that unjust enrichment."[124]

The recitation of the allegations of the Amended Complaint set forth above
demonstrates that it seeks to recover the money and property that Defendants allegedly
wrongfully acquired.  Despite the superficial label "damages," at its essence the
Amended Complaint seeks restitution in the form of money and property to be returned
to RDI.  Because that type of loss cannot be insured, the Court concludes that Scottsdale
has shown, as a matter of law, that the Amended Complaint does not seek a Covered Loss
under the Scottsdale Policy.  The Court therefore concludes that Scottsdale did not have
a duty to defend in connection with the Underlying Action.  Accordingly, the Scottsdale
Motion regarding this claim is **GRANTED**, and the Trustee Motion regarding this claim
is **DENIED**.

### 2.    Breach of Implied Covenant of Good Faith and Fair Dealing

The Trustee further argues that Scottsdale breached the implied covenant of good
faith and fair dealing.[125]  In its above analysis of the Scottsdale Motion, the Court
concludes that Scottsdale did not have a duty to defend in the Underlying Action.
Therefore, Scottsdale was not in breach of a contract.  Without a viable breach of contract
claim, "an insured's cause of action for breach of the implied covenant of good faith and
fair dealing will fail as a matter of law."  *Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of
Pittsburgh, PA*, 2018 WL 4962033, at *4 (N.D. Cal. Oct. 12, 2018); *see also Behnke v. State
Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1470 (2011) (concluding that the bad faith
denial of insurance benefits claim fails as a matter of law when the plaintiff has no viable
breach of contract claim).  Accordingly, the Scottsdale Motion regarding this claim is
**GRANTED**, and the Trustee Motion regarding this claim is **DENIED**.

## V.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.    The Scottsdale Motion for summary judgment [ECF No. 49] is
**GRANTED**.

2.    The Trustee Motion for summary judgment [ECF No. 50] is **DENIED**.

---

[124]    *Id.* at ¶¶ 221 & 222.

[125]    Trustee Motion 29:22-30:26.

3.    Judgment shall issue accordingly.

**IT IS SO ORDERED.**

Dated:  January 21, 2025

John W. Holcomb
UNITED STATES DISTRICT JUDGE